IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

JEROME M. MERAZ                                                                  PLAINTIFF

v.                  Civil No. 05-3033

CHUCK MEDFORD, Sheriff,
Carroll County, Arkansas; LT.
BETH REELY; MARK LOTT;
MIKE BROWN; and WALT
NEOFTSGER                                                  DEFENDANTS

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Jerome Meraz brings this pro se civil rights action pursuant to 42 U.S.C. § 1983. Meraz contends his federal constitutional rights were violated when he was not provided with proper medical care after he was injured in an automobile accident while being transported to the Carroll County Detention Center.

On December 7, 2005, defendants filed a motion for summary judgment (Doc. 32). On January 30, 2006, the undersigned entered an order (Doc. 40) directing the plaintiff to complete, sign and return an attached questionnaire that would serve as his response to the motion for summary judgment. On February 24, 2006, plaintiff's response to the court's questionnaire (Doc. 41) was filed. The case is currently before the undersigned for the issuance of a report and recommendation on the summary judgment motion.

**I. BACKGROUND**

On April 15, 2005, Meraz was transported from the Arkansas Department of Correction (ADC) to the Carroll County Detention Center (CCDC) for a court appearance. *Plaintiff's*

AO72A
(Rev. 8/82)

*Response* (hereinafter *Resp.* at ¶ 1. At 4:10 p.m. on April 15, 2005, the jail transport van, owned by the Carroll County Sheriff's Department and being driven by John Rains, was rear-ended by a pick-up truck, owned and drive by Melvin K. Usrey. *Id.* at ¶ 2.

The accident occurred in Green Forest and officers from the Green Forest Police Department responded to the scene of the accident. *Resp.* at ¶ 3. A third vehicle was involved in the accident, a 4-door Honda being driven by Pamela Fancher. *Id.* at ¶ 4. The van was between the Honda and the pick-up. *Id.* at ¶ 5. All three vehicles were functional and no vehicle had to be towed from the scene. *Id.*

According to the accident report, no occupants of any of the vehicles reported any injury at the time. *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 2. Meraz states that he was evaluated first by the paramedics. *Resp.* at ¶ 7. He indicates he told them at the present time he seemed to be functioning fine. *Id.* However, he states he told them he felt a tightness on the right side of his neck and down into his shoulder blades. *Id.* After his vitals were taken, Meraz asserts the paramedics stated they would not be taking him with them at the time and they needed him to sign something. *Id.*

Meraz maintains Officer Sheri Shurp was standing off to the side. *Resp.* at ¶ 7. Meraz asserts he was told by the paramedics that if he got to feeling worse he needed to tell the jailer so he could be taken up and looked at. *Id.* While John Rains was being worked on, Meraz indicates another officer took him to the jail. *Id.* Before they left, Meraz states he told Rains what the paramedics had said. *Id.*

At the scene, Meraz signed a patient refusal of treatment and/or ambulance transport. *Resp.* at ¶ 8. However, Meraz states he did not read what he was asked to sign and does not

recall what they said it was. *Id.* If he had read it or been told what it was, Meraz maintains he would not have signed it. *Id.*

Meraz completed a witness statement in which he said: "We stoped the truck behind us slammed us. John was pumping our brake to no avail and tapped the car in front of us." *Defts' Ex.* 3.

When they made a hasty stop to avoid hitting the car in front of them, Meraz states he was thrown forward. *Resp.* at ¶ 10. He was grabbing for the front seats, missed the driver seat, and hit Rains in the head. *Id.* Meraz states their bodies were still in motion when the truck hit them. *Id.*

Meraz was booked into the CCDC at 4:45 pm. *Defts' Ex.* 5. He was in a "good mood" and "joking about the accident and John." *Id.* Meraz asserts he repeated what he had been told by the paramedics. *Id.*

During Meraz's intake into the CCDC, he completed and signed an inmate medical questionnaire in which he stated he had no pain, bleeding, or other symptoms suggesting emergency medical service was needed, and that he did not have any other medical condition the jail staff needed to be aware of. *Defts' Ex.* 6. However, Meraz states he told the officer how he felt about the accident. *Resp.* at ¶ 12. Meraz believes what he said is down in the computer. *Id.* However, he was given a stack of papers to sign and he just signed where indicated. *Id.*

At 12:00 p.m. on April 15, 2005, Meraz submitted a request in which he stated his back and neck had started hurting last night and getting stiff this morning.[1] *Resp.* at ¶ 13. Meraz

---

[1] Meraz was asked when he wrote 1200 pm on this request whether it was noon or midnight. He replied it was noon. *Resp.* at ¶ 14. As the accident occurred at 4:10 p.m. on April 15th, the court assumes this request was actually made on April 16th not the 15th.

stated he felt like a board. *Id.* He stated he thought he felt bad and indicated John Rains had told him that if he got to feeling bad to let someone know so he could be looked at. *Id.*

Meraz was given some Tylenol. *Resp.* at ¶ 15. The Tylenol did not help. *Id.*

On April 16, 2005, at 5 p.m., Meraz submitted a request in which he stated he needed to talk to John Rains ASAP. *Resp.* at ¶ 17. Meraz also stated he needed pain medication. *Id.* After some delay, Meraz was given Tylenol. *Id.* at ¶ 18.

Meraz talked to Rains. *Resp.* at ¶ 19. Meraz told Rains how he felt. *Id.* In response, Rains indicated "Beth had told him that [Meraz] would be going to the hospital Monday." *Id.*

On April 16, 2005, at 6:00 p.m. Meraz submitted a request/medical form. *Resp.* at ¶ 20. He stated he needed to talk to John Rains ASAP. *Id.* Meraz indicated he also needed pain medication. *Id.*

John Rains spoke with Meraz in the booking room at 2326 (11:26 p.m.). *Resp.* at ¶ 21. Meraz was not given Tylenol or anything for the pain because he could only take it three or four times a day per instructions. *Id.* at ¶ 22.

On April 17, 2005, Meraz made no requests for medical care or treatment. *Resp.* at ¶ 23. On April 18, 2005, at 9:30[2] Meraz submitted a request. *Id.* at ¶ 24. He stated his back and neck were sore. *Id.* He indicated the Aspirin did not help. *Id.* He indicated John had said if he didn't feel better Meraz should let them know so that he could be taken to be looked at. *Id.*

In response, jail administrator Beth Reely noted that Meraz was scheduled to go to court that day and back to the ADC the next day. *Defts' Ex.* 12. She noted Meraz was given Tylenol. *Id.* Meraz indicates he did not receive a copy of this response until a later time. *Resp.* at ¶ 25.

---

[2]This request form does not indicate if it was submitted at 9:30 a.m. or 9:30 p.m.

AO72A
(Rev. 8/82)

On April 18, 2005, at 3:30 p.m. Meraz submitted a request stating he needed to speak with John Rains ASAP. *Resp.* at ¶ 26. Meraz asked if Rains could be called. *Id.* In response, Meraz was told that Rains had been called. *Id.* at ¶ 27. Although Meraz indicates he spoke with Rains, Meraz states he cannot recall the conversation. *Id.* at ¶ 28.

On April 18, 2005, Sheriff Chuck Medford wrote a letter to the ADC to inform it that after Meraz had been picked up from the Brickeys Unit by Deputy Rains the Carroll County van had been involved in a car accident but that no injuries were evident at that time. *Resp.* at ¶ 29. Since that time, Sheriff Medford noted that Meraz had complained of stiffness in his neck, shoulders, and back. *Id.* at ¶ 30. He stated Meraz had been provided with over the counter pain medication. *Id.*

Meraz received Tylenol three times a day during his incarceration at the CCDC. *Resp.* at ¶ 31. However, Meraz contends the medication gave him no relief. *Id.* at ¶ 53. On April 19, 2005, at 6:00 a.m. Meraz was transported back to the ADC. *Id.* at ¶ 32.

On March 17, 2005, approximately a month before Meraz's transport to the CCDC, he submitted a medical request form in which he stated he had chronic back, neck, and shoulder pain. *Resp.* at ¶ 33. Meraz indicates everything hurt or bothered him. *Id.* He believes it was caused from lack of exercise and work. *Id.*

On April 19, 2005, the day Meraz returned to the ADC from the CCDC, he was seen regarding his complaint that he had a "kink" in his neck since Friday, the day of the car accident, a headache, and a pinch in his lower back. *Resp.* at ¶ 34. Meraz was prescribed an over the counter medication Motrin or Ibuprofen, 600 mg., three times a day, for three days. *Id.* at ¶ 35.

On April 22, 2005, Meraz was seen at the ADC complaining of a "kink" to his neck.

AO72A
(Rev. 8/82)

*Resp.* at ¶ 36. He wanted his complaint to be treated as an emergency. *Id.* Meraz was instructed that this wouldn't be an emergency and that he was to continue to take the Ibuprofen that had been given. *Id.* at ¶ 37.

On April 28, 2005, Meraz was seen at the ADC. *Resp.* at ¶ 38. It was a follow-up visit on his complaint of a stiff neck. *Id.* According to the medical records, Meraz was noted to have a good range of motion, no tension, no spasm. *Defts' Ex.* 17 at page 30 & page 42. His examination was normal. *Id.*

According to Meraz, the nurse that examined him on April 19th didn't like what she saw and wanted Ms. Delight to look at him. *Resp.* at ¶ 38. When he saw Ms. Delight on the 28th, however, Meraz states she spent fifteen seconds on him and said he was fine and everything was normal. *Id.* Meraz indicates there was a difference of opinion that day and from then on. *Id.* He states Ms. Delight seldom found anything wrong with anyone she saw and was later asked to leave or was fired because of her attitude. *Id.*

The only medications given to Meraz while he was at the ADC were Excedrin, Atenolol (a high blood pressure medication), Dexamethasone (a steroid), and Motrin. *Resp.* at ¶ 39. On May 23, 2005, Meraz's cervical spine was x-rayed and no acute fracture or dislocation was present. *Resp.* at ¶ 40. There were degenerative changes with spurring and loss of joint space associated with the degenerative change at the C5-6 level. *Id.*

While Meraz was at the CCDC, he did not communicate directly with Sheriff Medford about his request for medical care. *Resp.* at ¶ 41. Meraz was asked to describe how he believed Sheriff Medford exhibited deliberate indifference to his serious medical needs. Meraz replied:

AO72A
(Rev. 8/82)

> Chuck Medford been in law enforcement for the last 20 years give or take. He has been and dealt with numerous accidents. Would know how easy it is to be hurt in an auto accident. He knew first hand about the accident and knew of my complaints of being hurt. His only action was to type a letter to the ADC. I was a passenger in his vehicle and in his custody and there for his responsibility.

*Resp.* at ¶ 48.

Meraz never spoke directly with Reely about his request for medical care. *Id.* at ¶ 42. However, he does believe he sent her requests for medical care but at the time he did not get a response. *Id.* Meraz was asked to describe how he believed Reely exhibited deliberate indifference to his serious medical needs. Meraz replied:

> Beth Reely has sole power beside Chuck Medford to make Doctors appointment, How goes or not. She knew of the accident from my month and how I felt upon arrival at CCDC and of the progression of my pain and discomfort and she did not have me transported to the hospital.

*Resp.* at ¶ 49.

Meraz spoke with Mark Lott and Mike Brown about needing medical care. *Resp.* at ¶ 43 & ¶ 44. They both indicated they would pass the information on and told Meraz to fill out a medical request form. *Id.* Meraz also spoke with Walt Noftsger. *Id.* at ¶ 45. Noftsger told Meraz that it was Reely's call. *Id.* Noftsger indicated he would speak to Reely about Meraz's complaint. *Id.* With respect Lott, Brown, and Noftsger, when Meraz was asked to describe how they exhibited deliberate indifference to his serious medical needs, he replied: "He listened to my complaints and picked up my medical request and nothing else that I know of to help it." *Id.* at ¶¶ 50-52.

The CCDC did not have a jail nurse or jail doctor. *Resp.* at ¶ 46. According to Meraz, Reely made the decision whether an inmate needed to be seen by medical personnel. *Id.* If you

AO72A
(Rev. 8/82)

got a reply back, Meraz asserts it was usually to have your family make an appointment and pay for it and they would take you. *Id.*

Meraz was asked whether he contended a policy or custom of Carroll County resulted in his being denied adequate medical care. He replied:

> If of no other policy. If it was paid for they will take you it could have been billed to Mr. Urshery the guy that hit us or the insurance company. I thought that if you were hurt while in the care of the jail you were to be seen at least by a nurse if not a doctor.

*Resp.* at ¶ 54.

Meraz was asked to describe the injuries he sustained during the automobile accident. He responded as follows:

> At first it was a tightness on the right side from the top of my neck down to the upper middle of the shoulder blades. Then it was stiffness painful. Then it hurt to lift my head off the pillow. Hurt to hold my head up and stayed in bed most of the time. I still have pain in my neck and have seen a Doctor since I have been out. She found that I have spasms on my right side of my neck.

*Resp.* at ¶ 47.

Meraz has also attached to his summary judgment response a number of documents related to various grievances he has submitted regarding his medical treatment at the ADC. All documents deal with various stages of the grievance process.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that

-8-

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### III. DISCUSSION

Defendants have now moved for summary judgment. Defendants first contend they have been sued in their official capacity only. Defendants next contend no constitutional violation exists. Finally, defendants contend there is no basis on which they can be held liable.

*Official and Individual Capacity Claims*

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution. *West v. Atkins*, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).

AO72A
(Rev. 8/82)

Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or claims may be stated against a defendant in both his individual and his official capacities. In *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the distinction between individual and official capacity suits. As explained by the *Gorman* case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. *See Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991). Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. *Id.* 502 U.S. at 24-27, 112 S. Ct. at 361-62 (1991). Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. *Id.* 502 U.S. at 25-27, 112 S. Ct. at 362.

*Gorman*, 152 F.3d at 914.

The Eighth Circuit has advised plaintiffs to specifically plead whether government agents are being sued in their official or individual capacities to ensure prompt notice of potential personal liability. *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir. 1989). *See also Andrus v. Arkansas*, 197 F.3d 953 (8th Cir. 1999)(In actions against officers specific pleading of individual capacity is required to put public officials on notice they will be exposed to personal liability). When the plaintiff fails to state whether he is suing an official in his individual capacity, the Eighth Circuit has construed the claim to be against the official in his official capacity only. *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999)("[I]n order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity."); *Egerdahl v. Hibbing Community College*, 72 F.3d 615, 620 (8th Cir.

AO 72A
(Rev. 8/82)

1995)("*Nix* requires that a plaintiff's complaint contain a clear statement of her wish to sue defendants in their personal capacities. Neither a cryptic hint in a plaintiff's complaint nor a statement made in response to a motion to dismiss is sufficient.").

A review of the complaint in this case shows that plaintiff has failed to specifically plead whether the individually named defendants were being sued in their official or individual capacity. However, the court has an obligation to liberally construe a pro se complaint. *Haines v. Krener*, 404 U.S. 519, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972). *See also White v. Wyrick*, 530 F.2d 818, 819 (8th Cir. 1976)(finding pro se petition should be "interpreted liberally and . . . should be construed to encompass any allegation stating federal relief"). In so doing, we must keep in mind that the plaintiff is without legal expertise and he prepared his own pleading. *Bracken v. Dormire*, 247 F.3d 699, 704 (8th Cir. 2001), *cert. denied*, ___ U.S. ___, 122 S. Ct. 302 (2001). For this reason, we construe Meraz's complaint to be asserting both individual and official capacity claims.

### *Denial of Medical Care*

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend VIII. Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than

negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)). *See also Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:

> As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976). Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106, 97 S. Ct. at 292.

AO72A
(Rev. 8/82)

*Dulany*, 132 F.3d at 1239. *See also Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001).

In this case, Meraz contends the defendants denied him medical care following the automobile accident. Meraz was booked into the CCDC on April 15, 2005, and transferred back to the ADC four days later on April 19, 2005.

Meraz was examined by paramedics at the scene of the accident. He also signed a form refusing medical treatment. Although Meraz now asserts he did not know what he was signing, the form was presented to him by the paramedics and he makes no argument any of the defendants put any pressure on him or attempted in anyway to influence his decision whether or not to he should seek immediate medical treatment or sign the refusal or medical treatment document.

After he submitted a medical request complaining of back and neck pain and stiffness, Meraz was given over the counter pain medication. The ADC was also notified of his complaints.

Once he returned to the ADC, Meraz sought medical treatment. After an examination, Meraz was given an over the counter pain medication. While Meraz disagrees with the assessment made at the ADC, this does nothing to establish deliberate indifference on the part of the CCDC defendants.

We will assume for purposes of this summary judgment motion that Meraz's neck and back pain and stiffness constituted a serious medical need. We nevertheless believe the defendants are entitled to summary judgment. Meraz has presented no evidence that the defendants ignored an acute or escalating situation or that the delay in his receiving medical

treatment adversely affected his prognosis. *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999); *Beyerback v. Sears*, 49 F.3d 1324, 1327 (8th Cir. 19950(inmate's failure to present verifying medical evidence constituted failure to establish objective component of the claim). This failure to show that a delay in medical treatment adversely affected his prognosis or condition is fatal to his claim.

## IV. CONCLUSION

I therefore recommend that the defendants' motion for summary judgment be granted and this case dismissed.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 10th day of April 2006.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)